IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

    Plaintiff,

vs.                                      CASE NO. 1:99cv121 MMP

ASPLUNDH TREE EXPERT CO.,

    Defendant.

_____/

## ORDER

The following motions are pending before the Court: (1) Defendant's Motion for Summary Judgment (doc. 65); (2) Plaintiff's Motion for Partial Summary Judgment on the Issue of Conciliation (doc. 67); (3) Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's First, Fifth, Seventh, Eighth, Tenth, and Eleventh Affirmative Defenses (doc. 68).

Plaintiff Equal Employment Opportunity Commission ("EEOC") alleges that Robert Lewis ("Lewis") was harassed because of his race, and that as a result of reporting such harassment, Defendant Asplundh Tree Expert Company ("Asplundh") retaliated by terminating Mr. Lewis. The Complaint in this case was filed pursuant to Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct allegedly unlawful employment practices by the Defendant on the basis of race and retaliation and to provide relief to Lewis who allegedly was adversely affected by such practices.

OFFICE OF CLERK
U. S. DISTRICT CT.
NORTH DIST., FLA.
GAINESVILLE, FLA.

02 FEB 20 PM 1: 10

FILED



Entered on docket 2/20/02 by atm
(Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCrP)
Copies sent to: Standard Party
Mattimoe

90

## I. Factual and Procedural Background

Asplundh is a family owned business headquartered in Willow Grove, Pennsylvania. Asplundh's Gainesville, Florida operations consisted of underground cable installation. This work was performed pursuant to a three-year contract (1993-1996) with the Gainesville Regional Utilities ("GRU"), which was to expire in October 1996. (See Def.'s Mem. Supp. Summ. J. at 3.)

Lewis began his employment with Asplundh in November 1995 as a laborer. Asplundh assigned Lewis to a three-man crew comprised of foreman George Sapp ("Sapp"), and co-laborer Dwayne Hooker ("Hooker"). Asplundh employed approximately eight three-man crews to perform GRU work at the time of Lewis' hire. During Lewis' employment, Asplundh's Gainesville office management consisted of Supervisor Bobby Vlacos ("Vlacos") and General Foreman, Larry Mattingly ("Mattingly"). (See id. at 4.)

To ensure Asplundh's contractual compliance, GRU employed four electric utility inspectors. One of those inspectors was Pete Evans ("Evans"), who had been employed by GRU for fourteen years. Evans was a GRU employee and was never paid or employed by Asplundh directly. As an inspector, Evans would visit Asplundh's work sites daily, observe the crews and inspect the work. A significant portion of the facts surrounding Lewis' employment are in dispute[1] and culminate with an incident on April 1, 1996, which gives rise to this claim.

---

[1] The Plaintiff relies in large part on Lewis' written statement and his deposition. Lewis described how his written statement was created when he stated in his deposition that "I didn't write this. I didn't print this up. So I can't say if it's exactly how I would have wrote it, because it's not something that I wrote. I was telling my wife what happened and then somebody else typed it. I mean, when I seen it, she had made a couple of mistakes. But it's not – it was not written by me." (See Pl.'s Depo. at 140.) It is clear in reading Plaintiff's deposition that by the time his deposition was taken, he could not specifically recall many of the instances he had

Mr. Lewis claims, in a statement provided to the EEOC, that he was subject to several incidents of racial harassment by Evans,[2] leading up to the April 1, 2001 incident. Lewis testified at his deposition that he notified his immediate foreman, Sapp, that he was upset with Evans' comments before the April 1, 1996, incident. In Lewis' written statement he did not describe complaining to any other Asplundh managers before April 1, 1996; however, in his deposition, Lewis claims that in February and March, he complained to Mattingly, the General Foreman. Although Lewis claims in his deposition to have notified Mattingly about racial statements made by Evans before April 1, he does not recall what he had said, what he had complained about, Mattingly's response, or where he had complained. It is clear that *after* April 1, 1996, that he complained to both Vlacos and Mattingly.

On April 1, 1996, Lewis claims that he was working at a Gainesville, Asplundh, worksite with Sapp and Hooker when Evans came from behind him and placed a rope which had been turned into a "noose" around Lewis' neck. Both Sapp and Hooker saw Evans place the "noose" around Lewis' neck. Apparently, Evans then pointed to a nearby tree which had branches that resembled "monkeys" and told Lewis that he would hang him up there with the "rest of your

---

complained about in his written statement. (See id.) While it is perfectly understandable that a witness may not be able to recall with a substantial amount of specificity incidents that had occurred years ago, it is equally difficult for the Court to piece together events from several conflicting accounts.

[2] There are several incidents that Lewis describes. The first concerns an incident where GRU inspectors Charlie Rodgers and Evans informed a black employee, "Billy," that he was performing wrong work. When Billy stopped and changed his method, Evans then laughed and said he was "just joking." The second incident occurred when Evans said to Mattingly: "Damn Robert [Lewis], you must have lead in your back pocket. All you do is sit on your ass." The third remark was when Evans bragged that his "garage was bigger than most of the [Asplundh's employees'] homes." (See Pl.'s Aff. at 1-4.)

family." (Pl.'s Aff. at 1-2.)

Later that day, Lewis complained to Mattingly about the incident. Lewis' written statement claims that Mattingly told Lewis that he would take Lewis to Evans' employer, GRU, to discuss the matter. However, several days later, Mattingly set up a meeting between Evans and Lewis where Evans apparently apologized for the incident. (See Pl.'s Dep. at 127.) After April 1, 1996, Evans allegedly told the other employees that he would hang them up in the "tree with the rest of the monkeys- just ask Robert." It is unclear whether Evans made this statement before or after he had apologized. (See id. at 131.) Lewis cannot recall any further harassing statements by Evans.

Lewis then claims that Mattingly later told him that he was "f------ himself out of a job," and that he asked Sapp to fire Lewis. (See Pl.'s Aff. at 2-4.) However, Lewis was not fired until June 20, 1996. Plaintiff additionally alleges that Vlacos and Mattingly also made racially discriminatory remarks to Sapp in regard to Lewis' complaint, although no statements were made directly to Lewis. Defendant alleges that its employees attempted to re-hire Lewis and were turned down, while Plaintiff alleges that the attempts to rehire him were conditioned on Lewis releasing any legal claim that he had against Asplundh.

The Defendant claims that the decision to fire Lewis was not motivated by his complaints against Evans, but instead were a natural result of a decrease in its Gainesville workforce. It is undisputed that in October 1996 Asplundh's contract with GRU ended, and all of Asplundh's employees were laid-off. (See Def.'s Req. for Admis. ¶ 23.)

On August 26, 1996, Lewis filed his Charge of Discrimination against Defendant, Asplundh, which the EEOC sent to Asplundh on August 29, 1996. The EEOC conducted an

investigation of Asplundh's practices, and on March 4, 1999, Debora West ("West") conducted a predetermination interview with the Defendant. On March 31, 1999, Federico Costales, District Director of the EEOC's Miami District Office, issued a Letter of Determination, finding that Defendant had violated Title VII of the Civil Rights Act, and inviting parties to join in a collective effort toward a just resolution of the matter by engaging in conciliation pursuant to Section 2000e-5(b) of Title VII.

On April 7, 1999, EEOC sent Defendant's in-house counsel the Commission's proposed Conciliation Agreement, advising Defendant to accept the agreement, submit a counter proposal to the EEOC or inform the EEOC that no agreement would be entered into by April 23, 1999. Ms. West's correspondence as well as the proposed Conciliation agreement failed to identify the theory of Asplundh's liability for Lewis' alleged race discrimination. In order to determine Asplundh's potential liability, Asplundh retained outside counsel of Allen, Norton & Blue, P.A. On April 28, 1999, Peter Sampo, partner in the firm's Coral Gables office, forwarded by facsimile the following correspondence to EEOC investigator West:

> The firm has been retained to represent [Asplundh] in the above-referenced matter. Your letter to General Counsel, Phillip Tatoian, dated April 7, 1999 and enclosing a Conciliation Agreement has been forwarded to me for response. In order for me to provide informed advise to my client about this issue, I would like to arrange a phone call with you to discuss this case and attempt to understand that Commission's basis for its determination. Therefore, I ask that you extend the time for responding to the proposed Conciliation Agreement until we have had an opportunity to review this matter and you and I have had an opportunity to discuss the issues.

(Letter from Sampo to West of 4/28/00, at 1.)

On April 29, 1999, one day after the foregoing correspondence was faxed to the EEOC,

the EEOC sent a letter to Defendant declaring that it had determined that efforts to conciliate had been unsuccessful.

The EEOC at no time responded to the Defendant's faxed letter or acknowledged having received such letter. On May 12, 1999, 13 days after declaring attempted conciliation unsuccessful, the EEOC filed the instant lawsuit in the United States District Court for the Northern District of Florida.

## II.    Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) sets forth the standard governing summary judgment. In its most basic form, summary judgment is appropriate where no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Addickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). Once the moving party has met its burden, the party opposing summary judgment may not simply rely on pleadings or mere denials of the allegations. Rather, the opposing party must adduce some evidence showing the material facts are in issue. See Anderson, 477 U.S. at 256. "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by its own affidavits or by the depositions, answers to

interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." Celonex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

The Eleventh Circuit Court of Appeals has restated the method for allocating burdens in a summary judgment motion. Specifically, in accordance with United States Supreme Court precedent, the Eleventh Circuit has stated as follows:

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes judgment.

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

### III. Discussion

#### A. Plaintiff's Motion for Summary Judgment on Issue of Conciliation

On February 26, 2001, Plaintiff moved for partial summary judgment on the issue of whether it satisfied the conciliation requirement of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. 42 U.S.C. § 2000e-5(b) provides in pertinent part: "If after investigation, the Commission determines there is reasonable cause to believe that the charge [of discrimination] is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b).

To satisfy the statutory requirement of conciliation, the EEOC must: (1) outline to the

employer the reasonable cause for its belief that Title VII has been violated; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer. EEOC v. Klinger Elec. Corp., 636 F.2d 104, 107 (5th Cir. 1981).[3] In evaluating whether the EEOC has adequately fulfilled this statutory requirement, "the fundamental question is the reasonableness and responsiveness of the EEOC's conduct under all the circumstances." Klinger, 636 F.2d at 107.

The Court in Klinger held that "summary judgment is far too harsh a sanction to impose on the EEOC even if the court should ultimately find that conciliation efforts were prematurely aborted." Id. The Court found that based on the **facts** before it, the district court should have entered a stay in order to allow the parties to negotiate an agreement. See id. This statutory mandate of conciliation was created to eliminate needless litigation when disputes between employers and employees could otherwise be settled outside of the courthouse forum. The Klinger court also stated, however, that the fact the EEOC actually negotiated with the employer for two years, and "in the absence of arbitrary and unreasonable conduct or substantial prejudice to the defendant, [is] enough evidence of the EEOC's good faith to make such a harsh remedy (summary judgment) unnecessary.

The facts in Klinger are materially different, and distinguishable, from those at hand. In Klinger, the EEOC actually negotiated for 6 months before terminating negotiations. Then, at

---

[3] In Bonner v. City of Prichard, 661 F.2d 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down by that court prior to the close of business on September 30, 1981. See also U.S. v. Beard, 41 F.3d 1486 (11th Cir. 1995).

*Case No: 1.99cv121*

the request of the employer (Klinger), negotiations resumed and were conducted for another 14 months before being terminated by the EEOC. In the case *sub judice*, the EEOC conducted, presumably, an investigation for over 2 years; on March 31, 1999, Federico Costales, District Director of the EEOC's Miami District Office, issued a Letter of Determination, finding that Defendant had violated Title VII of the Civil Rights Act, and inviting parties to join in a collective effort toward a just resolution of the matter by engaging in conciliation pursuant to Section 2000e-5(b) of Title VII.; on April 7, 1999, EEOC sent Defendant's in-house counsel the Commission's proposed Conciliation Agreement, advising Defendant to accept the agreement, submit a counter proposal to the EEOC or inform the EEOC that no agreement would be entered into by April 23, 1999; both Ms. West's correspondence and the proposed Conciliation agreement failed to identify the theory of Asplundh's liability for Lewis's alleged race discrimination; in order to determine Asplundh's potential liability, Asplundh retained outside counsel who, in turn, on April 28, 1999, forwarded by facsimile the following correspondence to EEOC investigator West:

> The firm has been retained to represent [Asplundh] in the above-referenced matter. Your letter to General Counsel, Phillip Tatoian, dated April 7, 1999 and enclosing a Conciliation Agreement has been forwarded to me for response. In order for me to provide informed advise to my client about this issue, I would like to arrange a phone call with you to discuss this case and attempt to understand that Commission's basis for its determination. Therefore, I ask that you extend the time for responding to the proposed Conciliation Agreement until we have had an opportunity to review this matter and you and I have had an opportunity to discuss the issues.

On April 29, 1999, **one day after the foregoing correspondence was faxed to the EEOC**, the EEOC sent a letter to Defendant declaring that it had determined that efforts to

*Case No: 1:99cv121*

conciliate had been unsuccessful.

In addition to the foregoing, and what makes this particular case so egregious and the need to negotiate before filing suit so essential, the employee, Lewis, even assuming that the defendant retaliated by firing him, **would have been out of a job in 4 months, as well as all other Asplundh employees on the Gainesville project, because at that time the GRU contract would have expired, and did expire, by its own terms.**

The Court finds in this instance that the EEOC did act in a grossly arbitrary manner and engage in unreasonable conduct in failing to fulfill its statutory requirement to conciliate the matter. The EEOC arbitrarily created a deadline and was particularly inflexible in enforcing its deadline. Clearly, Defendant's letter of April 28, 1999 establishes an intent on behalf of the Defendant to resolve the matter outside of the courtroom. The EEOC's response to the foregoing letter was the filing of the instant lawsuit one day thereafter. Although the EEOC may not force conciliation upon an unwilling employer, it is held to a standard of good faith. See id.

Plaintiff completely undermines its own argument in citing the case of EEOC v. Jacksonville Shipyards, Inc., 696 F. Supp. 1438, 1445 (M.D. Fla. 1998). In Jacksonville Shipyards, the Court found that the Commission is under no duty to attempt **further** conciliation when an employer is unwilling to discuss the charges filed. See id. However, it is clear from the facts of this case that the Defendant was not only willing to discuss the issues, once advised of EEOC's basis for its liability determination, but specifically asked to do so. Clearly the EEOC could have, and should have, delayed the filing of its complaint until

settlement discussions proved to be fruitful or futile. One can only imagine the time, legal fees, and costs, that have been expended in this matter because of the EEOC'S action.,

The Klinger court, *supra,* stated "On the facts before us now, the appropriate remedy, should the district court find that the EEOC has not adequately attempted conciliation, would be the stay permitted by 42 U.S.C. § 2000e-5(f)(1).... This approach will preserve the authority of the EEOC **so long as it acts in good faith, while encouraging voluntary compliance and reserving judicial action as a last resort** "(emphasis not in original). The facts of this case amply demonstrate that the EEOC did not act in good faith, did not encourage voluntary compliance, and did not reserve judicial action as a last resort. A stay does not, therefore, become the appropriate remedy in the instant case. but dismissal does.[4]

Based on the foregoing, it is **ORDERED AND ADJUDGED** that:

1. That Plaintiff has not satisfied the conciliation requirement of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. .

2 .This cause of action is Dismissed and the Clerk shall enter judgment accordingly.

3. The defendant is entitled to its costs, expenses, and attorney fees in defending this action and the court specifically reserves jurisdiction to enter the same.

---

[4]Dismissal is not too harsh of a remedy as it does not operate to bar the individual claim of Mr. Lewis. The EEOC can still issue him a "right to sue letter" and a private suit maintained. See: Truvillion v. King's Daughter Hospital, 614 F.2d 520 (5th Cir. 1980) .

*Case No: 1.99cv121*

4. Defendant shall, within 30 days, file its required affidavits and statements as to costs, expenses, reasonable hours expended in defending this action, and a reasonable hourly rate for its services. Plaintiff shall file any counter affidavits and memorandum within 30 days thereafter.

5. The court does not here reach or determine any of the other summary judgment issues presented by the parties.

**DONE AND ORDERED** this _20TH_ day of February, 2002.

                                                     Maurice M. Paul
                                          Senior United States District Judge